IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                 Criminal Action No. 5:13CR23-01
                                               (STAMP)
MICHAEL T. McGEE,

       Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION FOR ARREST OF JUDGMENT
## AND MOTION FOR A NEW TRIAL

### I.  Procedural History

     The defendant, Michael T. McGee ("McGee"), was named in a two-count indictment charging him with, as to Count 1, conspiracy to possess with the intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 812(c), and, as to Count 2, possession with intent to distribute in violation of 21 U.S.C. § 812(c).  After a three-day jury trial, the defendant was found guilty as to Count 1 and was acquitted of the charge in Count 2. Thereafter, the defendant made a timely motion for arrest of judgment and for a new trial.  In that motion, the defendant requests that this Court arrest judgment, dismiss the indictment, and set aside the verdicts of the jury and enter a judgment of acquittal or, in the alternative, grant the defendant a new trial. The government filed a response to that motion.  As such, the motion is now ripe for review by this Court.

## II.  Facts

As stated previously, the defendant was originally charged in a two-count indictment.  Count 1 of the indictment charged:

> Beginning by at least November of 2012, the exact date being unknown to the Grand Jury, and continuing to the date of the indictment, in Hancock County, within the Northern District of West Virginia, and elsewhere, the defendant **MICHAEL T. MCGEE** and **RONALD SNIDER** did knowingly and willfully combine, conspire, confederate and agree and have a tacit understanding with each other and with other persons known and unknown to the Grand Jury to commit an offense against the United States, that is: to violate Title 21, United States Code, Section 841(a)(1).  It was a purpose and object of the conspiracy to knowingly and intentionally possess with intent to distribute and to distribute cocaine, a Schedule II, narcotic drug-controlled substance, as designated by Title 21, United States Code, Section 812(c), Schedule II(a)(4).

During the three-day trial, several witnesses were called by the government and by the defendant.  As to the conspiracy charge, however, three witnesses were crucial to the government's case, Ashley Hayes ("Hayes"), Ronald Snider ("Snider"), and Mark Watson ("Watson"), and will be discussed herein.

### A.  Ashley Hayes

Hayes first testified, at the time of trial, that she had known McGee for a little over a year.  Further, Hayes testified that she had begun buying drugs from McGee about three to four months before she began buying from him as a confidential informant in November 2012.  Hayes testified that she began working for the Jefferson County Drug Task Force ("drug task force") in November 2012 and was buying crack, cocaine, and heroin from McGee.  Hayes

testified that she had bought cocaine from the defendant with the drug task force on five occasions.

Hayes further testified that McGee carried all three drugs on him at all times. She testified that normally she would contact McGee by phone, meet with him (at which point she would get in his car), and only then she would tell him what she wanted. Hayes further testified that she did not sell the drugs that she would obtain from McGee but rather used the drugs to "get high." Additionally, Hayes testified that when she met McGee, he would be in one of two cars each time. Hayes also testified that for one of the transactions with McGee, McGee stated "I'll be meeting my dude at 7:00" and thereafter met with Hayes to distribute cocaine to her after 7:00. Additionally, she testified that when she asked about who he had met, who Hayes testified was named "Baby Boy," McGee stated that Baby Boy "was one of his people." Hayes testified that she believed this meant that Baby Boy was a "dope boy" (a drug dealer).

B.   Ronald Snider

Snider first testified that Watson, an acquaintance he knew from high school and an alleged co-conspirator, had contacted him about obtaining cocaine for him sometime in March 2013. Snider testified that prior to Watson contacting him then, the two had not had a drug relationship. Snider then said that he asked around to find out where he could obtain cocaine but then "happened to see

[the defendant] one day and [he] asked him about [purchasing cocaine]." Further, Snider testified that he asked McGee if he could help him to get something and that Snider told McGee he wanted cocaine. Snider stated that McGee said that he could help him out and that Snider should let him know what Snider needed.

Snider then testified that between February 25, 2013 and April 2, 2013, he and Watson went to buy cocaine from McGee two to three times. Snider testified that each time they met McGee and that each time they followed a similar scenario: Watson would pick up Snider, Snider would then direct Watson where to meet McGee, once they met McGee, Snider would go to the vehicle that McGee was driving that day, Snider would get in and exchange the cash given to him from Watson for the cocaine, and then Snider and Watson would go back to wherever Watson had picked Snider up (either Weirton, West Virginia or Steubenville, Ohio).

Snider further testified that the last buy he conducted with Watson was on April 2, 2013, which turned out to be a "buy bust" by the drug task force (this is when Watson was working for the drug task force). Snider testified that on April 1, 2013, Watson had called him and asked him to get him cocaine. The next day, Watson picked Snider up in Steubenville, Ohio and Snider called McGee. Snider testified that the two rode past McGee and then turned around and eventually parked in front of McGee. Snider stated that they were at the most 100 meters from McGee's vehicle. Snider

testified that he had gotten $800 from Watson before going to McGee's vehicle. He then went to McGee's car and gave McGee $600, keeping $200 and a pinch of cocaine for himself.

On cross-examination, Snider testified that he did not know Hayes. Further, he testified that not all the calls he had placed or received from Watson were drug related and that each time that he and Watson got cocaine from McGee, they met McGee in Steubenville, Ohio. Snider further testified that McGee did not know Watson. Finally, Snider testified that Watson had mentioned his friend Billy on April 2, 2013 (which was on a police recording) but that Snider was unaware that Billy was a person to whom Watson would be redistributing the cocaine. Snider testified that although Watson had talked about Billy with Snider, he did not know that Watson was redistributing the cocaine but rather thought that Watson was obtaining the cocaine for personal use.

C.   Mark Watson

Watson was the last to testify of the persons that were used as the primary evidence for the conspiracy charged in the indictment. Watson first testified that he had reconnected with Snider during winter/early spring 2013 because one of his friends had mentioned that Snider could get him cocaine. Watson testified that he had gotten Snider's phone number from a friend and that all calls and text messages with Snider were drug related thereafter. Watson testified that he had been hanging around a group of three

other men who liked to party and play cards. Further, Watson stated that most of them would receive a disability check and that they would all receive it around the same time of the month, the 20th. Watson testified that when they would receive their disability checks, Watson would contact Snider to get cocaine for the group so that Watson could redistribute the cocaine to the group members.

Watson testified that he began to work with the drug task force after he was "busted" on Good Friday 2013 for being in possession of cocaine. Before that time, however, Watson testified that he had twice met Snider to go get cocaine in Weirton, West Virginia. Watson testified that both times, he had called Snider and told him the amount of cocaine he wanted; which he testified was two to three eightballs, or 3-1/2 grams, of cocaine. Snider would then call McGee and Snider would be back in contact with Watson within 24 hours. Watson further testified that he told Snider that the amount of cocaine had to be right because the money he was giving Snider for the cocaine was not just his money. Further, Watson testified that in a two-day period, he and his friends would make three or four purchases through Snider.

As to the "buy bust" on April 2, 2013, Watson's testimony paralleled the basic scheme that Snider had discussed in his testimony. However, Watson further testified that the reason that they passed McGee and then had to turn around was because McGee

told Snider that the area was "hot."  Watson testified that this meant that there was a police presence in the area where they were originally going to meet.  Further, Watson testified that he remembered McGee using only two vehicles for the other buys that he had done with Snider but that during this buy, McGee was using a different vehicle.  However, Watson testified that he drove the same car for each purchase.  Finally, Watson testified that McGee was parked 20-30 yards behind Watson the day of the April 2nd buy.

The main difference, however, in the testimony from Watson and Snider is in the amount of knowledge Snider testified he had that Watson was redistributing the cocaine to his friends.  Watson testified that before he became a confidential informant, he had told Snider he was getting the cocaine for himself and the other members of his group.  On cross-examination, Watson testified that he had never purchased cocaine directly from McGee and that he does not know McGee personally.  Additionally, Watson testified that he believed McGee saw him sitting in the car during the buys but that he did not know that for sure.  Finally, Watson testified that he was getting cocaine from McGee through Snider but that Watson was aware of another source that Snider would use to obtain cocaine.

### III.   Remedies Sought By the Defendant

#### A.   Arrest of Judgment

A court may only arrest judgment if "(1) the indictment or information does not charge an offense; or (2) the court does not

7

have jurisdiction of the charged offense." Fed. R. Crim. P. 34(a); United States v. Lias, 173 F.2d 685, 687 (4th Cir. 1949). Any ruling whose validity depends on evidence taken at trial is not reviewable by a motion in arrest of judgment. United States v. Holland, 1:08CR00054, 2009 WL 1507146, *1 (W.D. Va. May 29, 2009) subsequently aff'd, 417 F. App'x 359 (4th Cir. 2011) (citing United States v. Zisblatt, 172 F.2d 740, 742 (2d Cir. 1949)).

The defendant argues that this Court should arrest the judgment and requests dismissal of the indictment because this Court lacked jurisdiction to hear the conspiracy claim. The defendant asserts that the government was unable to prove that a conspiracy occurred in the Northern District of West Virginia. The defendant contends that because no overt acts were committed in furtherance of the conspiracy in the Northern District of West Virginia, this Court lacked jurisdiction.

On the other hand, the government asserts that the defendant's request for an arrest of judgment and dismissal of the indictment is in reality an argument about the sufficiency of the evidence and thus falls within the defendant's motion for acquittal. This Court agrees with the government insomuch as the defendant has not sufficiently pleaded grounds to grant a motion for arrest of judgment and dismissal of the indictment. As cited above, where the motion for arrest of judgment depends on evidence taken at trial and the insufficiency of that evidence, as the defendant has

8

asserted here, a motion for arrest of judgment must be denied. Holland, 2009 WL at *1, subsequently aff'd, 417 F. App'x 359 (4th Cir. 2011) (citing United States v. Zisblatt, 172 F.2d 740, 742 (2d Cir. 1949)); see also United States v. Guthrie, 814 F. Supp. 942, 944 (E.D. Wash. 1993), aff'd, 17 F.3d 397 (9th Cir. 1994); United States v. Kelly, 548 F. Supp. 1130, 1132 (E.D. Pa. 1982) (citing United States v. Sisson, 399 U.S. 267, 280-81 (1970)). Accordingly, this Court denies the defendant's motion for arrest of judgment and dismissal of the indictment without further consideration.

B.    Motion for Acquittal

The defendant argues that this Court should grant an acquittal and cites the standard for acquittal as the applicable standard of review.  Entry of judgment of acquittal is appropriate where "the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "A judgment of acquittal based on the insufficiency of evidence is a ruling by the court that as a matter of law the government's evidence is insufficient 'to establish factual guilt' on the charges in the indictment."  United States v. Alvarez, 351 F.3d 126, 129 (4th Cir. 2003) (quoting Smalis v. Pennsylvania, 476 U.S. 140, 144 (1986)).  In the United States Court of Appeals for the Fourth Circuit, the well-settled test for deciding a motion for a judgment of acquittal is "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable

to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." United States v. MacCloskey, 682 F.2d 468, 473 (4th Cir. 1982).

The government contends that because the defendant has requested a judgment of acquittal, this Court need not consider the defendant's other requests for relief–arrest of judgment and, in the alternative, a new trial. The government argues that the defendant's motion for acquittal "would end the matter for all times" and thus, no other requests for relief need to be addressed by this Court.

The defendant, however, has made, in the alternative, a motion for a new trial. The standard of review for a motion for a new trial, although not cited by the defendant in his brief, does not require this Court to "view the evidence in the light most favorable to the government" and this Court "may evaluate the credibility of the witnesses" if necessary. United States v. Arrington, 757 F.2d 1484, 1485 (4th Cir. 1985). Clearly, the motion for a new trial standard is more lenient than the standard for a judgment of acquittal.

The government is correct that if this Court were to find that an acquittal should be granted, this Court could not then grant the defendant's motion for a new trial. As the Supreme Court of the United States set forth in Burks v. United States, a court that finds that a judgment of acquittal is "just under the

circumstances" must grant a judgment of acquittal so that the defendant's constitutional rights are not violated under the Double Jeopardy Clause.  437 U.S. 1, 18 (1978).

This case presents a much different scenario than that discussed by the Supreme Court in <u>Burks</u>.  In this case, as set forth below, this Court finds that the defendant's motion for a new trial fails based on the defendant's insufficiency of evidence argument.  The defendant makes the same arguments for his request for a new trial and his request for acquittal.  Thus, because the standard of review is more lenient for a motion for a new trial versus a motion for acquittal, the defendant's motion for acquittal would fail also by implication.  As such, this Court will review the defendant's motion under the more lenient standard of review for a new trial.

## IV.  <u>Applicable Law</u>

According to Federal Rule of Criminal Procedure 33(a), a court "may vacate any judgment and grant a new trial if the interest of justice so requires."  A court, however, "should exercise its discretion to grant a new trial sparingly, and it should do so only when the evidence weighs heavily against the verdict."  <u>United States v. Chong Lam</u>, 677 F.3d 190, 203 (4th Cir. 2012) (internal quotations and citations omitted).  When deciding a motion under Rule 33, a court is not required to "view the evidence in the light most favorable to the government" and it "may evaluate the

11

credibility of the witnesses" if necessary. <u>United States v. Arrington</u>, 757 F.2d 1484, 1485 (4th Cir. 1985).

However, "[a] defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden." <u>United States v. Beidler</u>, 110 F.3d 1064, 1067 (4th Cir. 1997) (internal quotation omitted). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." <u>United States v. Burgos</u>, 94 F.3d 849, 862 (4th Cir. 1996).

## V. <u>Discussion</u>

The defendant makes two arguments in his supporting brief. First, the defendant contends that the government failed to provide sufficient evidence to show beyond a reasonable doubt that the defendant was engaged in a single conspiracy. Second, the defendant asserts that the evidence proffered by the government at trial varied fatally from the indictment in which the defendant was charged with conspiracy.

### A. <u>Sufficiency of the Evidence Generally</u>

#### 1. <u>Arguments of the Parties</u>

The defendant first argues that the government did not prove beyond a reasonable doubt that there was a conspiracy involving the defendant around November 2012 and lasting until about June 2013. The defendant contends that the government, at the most, presented evidence that there were multiple conspiracies rather than an

overall conspiracy.  The defendant claims those conspiracies were not proven to be connected merely because the government "implied" through its closing argument that the defendant's source for drugs was the same for both his sales to Hayes (November-January) and Snider (February-April).  The defendant next compares this case to precedent in the Fourth Circuit and argues that this case is different from the facts in United States v. Goss, 329 F.2d 180 (4th Cir. 1964).  Further, the defendant asserts that this case lacks co-conspirators and any overt acts.  The defendant contends that he was acquitted of the only overt act that occurred in West Virginia and that all other overt acts occurred in Steubenville.

The government asserts that it showed that the defendant was not a mere end-user of the drugs, he was selling by presenting several pieces of evidence (prior convictions, having two decent cars, being known in the community as a drug dealer, etc.).  Further, the government argues that it did not have to show a conspiracy between McGee and his supplier because the jury could find that there were co-conspirators who played other roles in the conspiracy (for example, a driver that was shown in one of the government's videos).  In addition, the government contends that it did not have to show that the defendant received his drugs from the same source throughout the conspiracy, rather, all the government needed to show was that the defendant had a consistent supply from the beginning to the end of the conspiracy.

Additionally, the government asserts that beginning in February 2013, officers concluded that there was a conspiracy between the defendant, Snider, and Watson. The government argues that it proved that all three shared the same conspiratorial mind of providing drugs to Watson in order for him to redistribute the drugs to his friends. This conclusion, the government argues, would be reasonable for a jury to make and would not be defeated by the fact that the defendant did not know the identity of Watson. Further, although Watson's status as a co-conspirator had ended before the "buy-bust" on April 2, 2013 (because he became a government informant in March 2013), Snider was still a co-conspirator at that time. In addition, the government asserts that the overt acts of Watson, before becoming a government informant, occurred in the Northern District of West Virginia.

As to the government introducing the defendant's prior convictions, the government asserts that it was not only relevant to prove a single conspiracy but it was relevant to prove the defendant's criminal intent and would have been admissible whether there was one, two, or multiple conspiracies alleged in the indictment. Finally, the government asserts that unlike Goss, there was a unitary scheme and a common aim in this case.

2. Application

In order to prove conspiracy to distribute and possess cocaine base with intent to distribute, the government was required to

establish beyond a reasonable doubt that: "(1) an agreement to distribute and 'possess cocaine with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy.'" <u>United States v. Yearwood</u>, 518 F.3d 220, 225-26 (4th Cir. 2008) (citing <u>United States v. Burgos</u>, 94 F.3d 849, 857 (en banc) (4th Cir. 1996)).  The gravamen of the crime "is an agreement to effectuate a criminal act." <u>United States v. Laughman</u>, 618 F.2d 1067, 1074 (4th Cir. 1980).

In this case, the government provided evidence that McGee would supply cocaine to Snider, Snider would supply cocaine to Watson, and Watson would supply the cocaine to his friends and would also obtain the cocaine for personal use.  This scheme was established by the testimony given at the trial.  One of the issues in this case, however, was whether or not the three persons involved had an agreement to effectuate the crime of distribution of cocaine.

"The Government is not required to prove that a defendant knew all his co-conspirators or all of the details of the conspiracy . . . ." <u>United States v. Burgos</u>, 94 F.3d 849, 861 (4th Cir. 1996) (en banc).  Here, the testimony given by Snider and Watson established that two to three buys from McGee occurred between February 25, 2013 and April 2, 2013.  Snider testified that all the buys were similar in that Watson would pick Snider up either in

Weirton, West Virginia or Steubenville, Ohio, and then the two would drive to meet McGee. Snider and Watson, however, differed in their testimony as to whether or not Snider had knowledge that Watson was going to redistribute the cocaine to his friends. Further, the two differed on whether or not McGee knew the identity of Watson.

First, McGee did not need to know the identity of Watson as long as he knew that Snider was distributing the cocaine to Watson. Id. Thus, it was enough that Watson and Snider both testified that the two would drive to meet McGee and that Snider would then act as a middleman, going to McGee's car to retrieve the cocaine in exchange for large amounts of currency. This shows that McGee and Snider had reached an agreement that McGee would obtain cocaine and then redistribute it to Snider. Further, given the testimony of Snider and Watson, it would be reasonable for a jury to find that McGee was aware that Snider was not obtaining the cocaine for personal use but rather was obtaining the cocaine for the driver of the car, Watson. This at least shows that McGee and Snider had an agreement to redistribute the cocaine to Watson.

Thus, because the two descriptions given by Watson and Snider of the transactions at least paralleled up to that point, it would be reasonable for a trier of fact to find that testimony credible and also to find, based on that testimony, that a conspiratorial state of mind was formed whether or not McGee knew the actual

identity of Watson.  All three possessed the same cocaine and all three were in possession of the cocaine in order to redistribute it.

Lastly, taking the timing of the conspiracy out of order, the government proffered evidence that McGee was involved in a conspiracy starting in November 2012 through the testimony of Hayes.  Hayes testified that when she would meet with McGee, she did not have to communicate what she needed each time because he always had a supply of at least three drugs, cocaine, "crack," and heroin.  Further, Hayes testified that McGee would have these available multiple times a day as Hayes was a heavy user. Additionally, Hayes testified that McGee had stated during one of their phone calls with each other that he would be meeting with someone at 7:00 p.m. and would be able to meet her after that to sell her drugs, and then when Hayes asked him about the person she thought he was meeting with, McGee stated that the person he met with "was one of his people."  Finally, Hayes testified that McGee had the reputation in the community as a drug dealer and that she was not aware that he had ever been a user of the drugs he distributed which can be inferred would be known to McGee's supplier if McGee continued to have product to sell to Hayes and later to Watson and Snider.  This evidence is coupled with Watson's testimony that McGee would be able to meet within 24 hours each time Watson would contact Snider about obtaining cocaine.  As such,

although not conclusively providing the identity of a supplier, the evidence was sufficient to allow a reasonable trier of fact to find beyond a reasonable doubt that McGee had a consistent supplier who knew that McGee was redistributing the cocaine to others.

Further, "inconsistent jury verdicts do not call into question the validity or legitimacy of the resulting guilty verdict[ ]." United States v. Powell, 469 U.S. 57, 64 (1984); Dunn v. United States, 284 U.S. 390, 393 (1932); United States v. Blankenship, 707 F.2d 807, 810 (4th Cir. 1983). Thus, even if a defendant is acquitted of an underlying overt act, a conspiracy may still be proven by the actions of co-conspirators because the government is not required to show that the "defendant *personally* committed an overt act." United States v. Cardwell, 433 F.3d 378, 391 (4th Cir. 2005) (emphasis added); see also United States v. Shabani, 513 U.S. 10, 16, 115 S. Ct. 382, 386, 130 L. Ed. 2d 225 (1994). As such, "venue on a conspiracy charge may be laid 'in any district in which a conspirator performs an overt act in furtherance of the conspiracy or performs acts that effectuate the object of the conspiracy,' even if the defendant charged with the conspiracy never entered the district." See Hyde v. United States, 225 U.S. 347, 356-57 (1912); United States v. Mitchell, 70 F. App'x 707, 711 (4th Cir. 2003).

Despite the defendant's argument otherwise, there was evidence that overt acts occurred in Weirton, West Virginia and thus in the

Northern District of West Virginia. Although the defendant was acquitted of the possession with intent to distribute charge, other overt acts occurred in West Virginia. Watson testified that he picked Snider up in Weirton, West Virginia for two drug buys before he became a confidential informant for the government. Snider at least confirmed the testimony of Watson for one of the drug buys (Snider testified that there were at least two if not three drug buys altogether). Thus, even though McGee did not enter West Virginia for the buys in which Watson picked up Snider in West Virginia, the fact that his co-conspirators met there is enough to establish an overt act in West Virginia and an overt act in furtherance of the conspiracy. Given the testimony from Snider and Watson, it would be reasonable for a trier of fact to find beyond a reasonable doubt that an overt act occurred and, more specifically, that an overt act in furtherance of the conspiracy occurred in West Virginia.

B.    <u>Variance</u>

    1.    <u>Arguments of the Parties</u>

    The defendant argues that the indictment and the evidence proffered by the government at the trial varied fatally. Further, the defendant asserts that the confusion caused by the fatal difference was made clear when the jury asked for clarification as to whether the evidence had to match the conspiracy dates alleged

in the indictment.[1]   As such, the defendant asserts that the government may have shown that the defendant was involved in separate incidences of illegal activity but the government failed to show that the illegal activity amounted to a conspiracy.   Thus, the defendant contends that he was prejudiced by the variance because the government was able to introduce evidence related to multiple conspiracies and the defendant's prior convictions, which it would not have been able to do if conspiracy had not been incorrectly charged in the indictment.

On the other hand, the government contends that there was no variance between the indictment and the evidence presented at trial.   The government asserts that McGee was continually selling cocaine from November 2012 to June 2013 and the nature of the conspiracy did not change over that time span.   The government then contends that even if there was a variance, the variance was not fatally prejudicial.   Here, the government argues that McGee stood trial alone and the only thing that varied was the strength of the evidence concerning the identities of his co-conspirators from the

---

[1]On the third day of trial, the jury began deliberations.   At one point during those deliberations, the jury submitted a question to this Court.   The parties were reconvened so that the Court could consider the jury's question as follows: "Do the two people mentioned in indictment one, do the conspiracy stated have to start in November?".   Both parties had an opportunity to argue for whether or not the Court should answer the question and if it did, how that question should be answered.   After hearing oral argument from both sides, this Court decided that the question should not be answered and instructed the jury to use the jury instructions given to them by the Court for guidance.

beginning of the conspiracy to the latter part of the conspiracy. Additionally, the government asserts that evidence of what transpired between McGee and Hayes was not prejudicial because it would have been admissible otherwise to prove his intent, knowledge of the drug trade, and his relationship to Hayes, a government witness.

2. Application

The Fifth Amendment to the United States Constitution provides for a right to indictment by grand jury. U.S. Const. amend. V; United States v. Floresca, 38 F.3d 706, 709 (4th Cir. 1994) (en banc). This constitutional right is violated, and a variance occurs "when the proof offered at trial permits a jury to convict a defendant for a different offense than that for which he was indicted." United States v. Redd, 161 F.3d 793, 795-96 (4th Cir. 1998) (citation omitted).

A variance, however, only violates a defendant's Fifth Amendment right if it prejudices him. Id. "[T]his occurs only when the variance either "surpris[es the defendant] at trial and hinder[s] the preparation of his defense, or . . . expos[es] him to the danger of a second prosecution for the same offense." Id. (citation omitted). However, "[a]s long as the proof at trial does not add anything new or constitute a broadening of the charges, then minor discrepancies between the Government's charges and the facts proved at trial generally are permissible." Id. In the case

at bar, a conspiracy prosecution, "a defendant may establish the existence of a material variance by showing that the indictment alleged a single conspiracy but that the government's proof at trial established the existence of multiple, separate conspiracies." United States v. Kennedy, 32 F.3d 876, 883 (4th Cir. 1994) (citing Kotteakos v. United States, 328 U.S. 750, 755–56 (1946); United States v. Jones, 880 F.2d 55, 66 (8th Cir. 1989)).

The defendant offers a comparison to Goss to support his argument that the government failed to prove that a single conspiracy took place. The defendant also cites the Fourth Circuit's McLean to sustain his argument. Although Goss appears to be the main focus of the defendant's argument, this Court will undertake a comparison of both.

In a case wherein the criminal "episodes are so far apart and so differently peopled as to destroy any semblance of [a] relationship" between the alleged co-conspirators, a single conspiracy has not been proven. Goss, 329 F.2d at 183. In Goss, the indictment alleged a one and a half year conspiracy involving six separate incidents of violating the revenue laws relating to possession, concealment, transportation, and distilling of whiskey. Id. at 181. The indictment named 25 conspirators, but only charged ten defendants. Id. All ten defendants were found guilty, but only four appealed to the Fourth Circuit. Id. Of those four defendants, two were involved in only one incident out of the six

incidents, one was involved in two of the six incidents, and the main co-conspirator, Aubrey, was only involved in four of the six incidents.  Id. at 182-183.  The Fourth Circuit reasoned that because the different co-conspirators did not have the same illegal end in mind but instead had his/her own distinct illegal end during the separate incidents, the government had failed to prove a single conspiracy.  Id. at 183.  Thus, because Aubrey was the only conspirator who maintained the same common aim throughout the conspiracy, and further was not even involved in two of the incidents used as evidence, the defendants' convictions had to be set aside.  Id. at 184.

This case is distinguishable because here McGee was involved in every incident that was brought in as evidence by the government.  Throughout his dealings with Snider and Watson, McGee maintained his status as a distributor of cocaine.  There were no incidents where cocaine was not involved.  Further, the government put on evidence that the defendant was known in the community as a distributor of cocaine and appeared to other persons he dealt with in his capacity as such.  The government provided evidence that the defendant used at least two vehicles, was not known as a user of drugs, was known to carry larger quantities of cocaine at all times made available within 24 hours, and was known to carry at least three types of drugs at all times.  Thus, this case is not similar to the facts in Goss.  The co-conspirators in this case, McGee, an

unknown supply source, Watson, and Snider, had a common aim during the conspiracy to distribute cocaine. Further, cocaine was the drug distributed during the entire conspiracy. Finally, the number of co-conspirators and the length of time elapsed between the alleged beginning of the conspiracy and the end of the conspiracy is much narrower in this case than that of the at least 25 conspirators, ten defendants, and year-and-a-half conspiracy alleged in <u>Goss</u>.

McLean is even less helpful for the defendant. In <u>McLean</u>, the government had alleged a 26-year conspiracy spanning from the 1970's through the 1990's, with different conspirators throughout the 26-year period. <u>McLean</u>, 166 F.3d at *4. The only common denominator between the numerous conspirators was one person and the law the defendants were breaking. <u>Id.</u> at *5. The Fourth Circuit reasoned that although the "government cannot be expected to identify precisely the beginning and ending dates of a conspiracy[,]" the government had clearly overreached in what it charged in the indictment because the evidence showed that (1) multiple drugs were involved and the type of drugs changed over the time of the conspiracy; (2) little evidence before the 1990's was provided that connected any of the conspirators; and (3) prior convictions were allowed to be used as evidence solely because the government pleaded such a lengthy period of time. <u>Id.</u> at *6. Further, as to the last point, the court found that the multiple

conspiracies charged clearly prejudiced the defendant because the only overt acts provided for anything before 1987 were the main conspirator's prior convictions.   Id.

This case is distinguishable for many reasons.  First, here, the conspiracy charged in the indictment only spans from November 2012 to June 2013.  In addition, "the trier of fact may find that the starting date of a conspiracy begins anytime in the time window alleged, so long as the time frame alleged places the defendant sufficiently on notice of the acts with which he is charged." United States v. Queen, 132 F.3d 991, 999 (4th Cir. 1997).  In this case, the conspiracy between Watson, Snider, and McGee occurred at the earliest in February 2013 and ended before April 2, 2013, when Watson acted as a confidential informant.  Further, testimony was given by Hayes that McGee was acting in the capacity of a distributor as early as November 2012 with an unknown supplier who was also distributing cocaine.  Thus, it would be reasonable for a trier of fact to find beyond a reasonable doubt that from November 2012 to at least April 2, 2013, McGee was being supplied cocaine which he was in turn selling to others and to other re-distributors in the Steubenville, Ohio area, including Weirton, West Virginia. Thus, the time period given in the indictment would have allowed McGee notice of the acts for which he was charged.

Second, in this case, McGee will not be prejudiced by the use of his prior convictions as evidence.  The evidence that was

allowed based on the testimony of Hayes would have been admissible to prove the defendant's intent and knowledge of the drug trade even if the conspiracy could only be proven beginning in February 2013. Under Federal Rule of Evidence 404(b), prior convictions may not be used to prove the character of a person but may be used for other reasons "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Under Rule 404(b), such evidence may be used as it was here to show the defendant's knowledge of the drug trade, the mechanics of the drug trade involved in the conspiracy, and the relationship between the defendant and the witness. United States v. Sanchez, 118 F.3d 192, 195 (4th Cir. 1997). Further, again as the prior convictions were used in this case, that type of evidence may be used to show that the defendant intended to possess the cocaine in order to distribute it. Id. Thus, even if this Court were to find that there was a variance between the indictment and the evidence at trial, the defendant would not have been prejudiced because his prior convictions and interactions with Hayes would have been otherwise admissible.

Finally, similar to Goss, this case is different from McLean because this case involves a much smaller, cohesive group of co-conspirators and a much narrower span of time alleged in the indictment. Additionally, McLean involved the distribution of multiple drugs that changed throughout the span of the 26 years.

Here, the only drug alleged to be distributed is cocaine and the evidence proffered at the trial showed that the defendant at all times from November 2012 to April 2, 2013 was distributing cocaine (even if it was not the only drug that McGee was distributing) and at least beginning in February 2013 had other co-conspirators who were redistributing the cocaine. Accordingly, there was sufficient evidence introduced by the government to defeat any claim of a variance from the indictment. Finally, even if such a variance did occur, the defendant was not prejudiced by it because his prior convictions would have been otherwise admissible.

As stated previously, because the defendant is unable to meet the more lenient standard for a motion for a new trial, his motion for an acquittal also fails because this Court would then have to look at the evidence in the light most favorable to the government.

## VI.   Conclusion

For the reasons set forth above, the defendant's motion for a new trial and motion for arrest of judgment are DENIED.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to the defendant and to counsel of record.

DATED:     March 12, 2014


/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE